United States District Court
Southern District of Texas

**ENTERED**

October 13, 2016

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| RONALD LEE CONVERSE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 3:15-CV-105 |
| | § | |
| CITY OF KEMAH, TEXAS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ronald Lee Converse, has sued the City of Kemah Police Department as well as Kemah Police Officers James Melton, Ruben Kimball, Marcus Way, and Daniel Kirby, Police Dispatcher Anna Marie Whelan, and Police Chief Greg Rikard, in their individual capacities. Converse alleges that his son, Chad Silvis, committed suicide in April 2014 by hanging himself in a jail cell, using a blanket provided to him by one of the officers. Converse bring claims on his own behalf as well as on behalf of his son's estate. The mother of Silvis's minor child has also filed a lawsuit in this Court, asserting nearly identical claims on behalf of Silvis's child, and the Court has consolidated these suits.

Converse filed his lawsuit in state probate court in March 2015, and the City removed it this Court. After an initial motion to dismiss, Converse filed another "Complaint." Defendants again filed a motion to dismiss. Converse then filed a "First Amended Complaint," which is his current live pleading. Converse acknowledges that some documentation and a videotape has been handed over by the City, but he alleges that no other discovery has taken place.

Converse's live pleading alleges that, twenty minutes after midnight on April 11, 2014, a passerby informed Officer Way of a "possible jumper" on a Kemah bridge. Officers Melton, Way, and Kimball all responded to the scene and Converse alleges that these officers then "gained actual knowledge that Mr. Silvis was suicidal." Silvis was arrested for an unstated reason and transported to the Kemah Police Department. During the booking process, Converse alleges that "Silvis [was] clearly depressed" and "told officers that he [was] unhappy, that he [was] ready to go to the doctor and see what is wrong with him," and "complain[ed] that he does not have anyone." Converse describes Silvis's behavior during the booking process as "erratic, with mood swings and irrational behavior and talk of suicide."

At some point after Silvis's arrest, but before he was placed in a cell, Officer Kimball gave Silvis a blanket. Silvis took this blanket into his cell, and Converse alleges that Officers Kimball, Way, and Kirby, as well as Dispatcher Whelan, all saw Silvis take the blanket into his cell with him. Converse alleges that "the individual Defendants knew Mr. Silvis was clearly in distress and wanting to complete his suicide attempt." Nonetheless, Converse alleges that Silvis was left "in a solitary cell, with a defective blanket with no monitoring, either in person or through the video cameras in the cell or checks instituted."

Converse alleges that, while in the cell, Silvis yelled and banged on the cell door, injuring his hands. Converse alleges that Silvis asked for a nurse for his hands, as well as for a cigarette, then "says that he should have jumped" and "that he is going to hurt himself." At 1:44 a.m.—less than an hour and a half after he was reported on the

bridge—Silvis hanged himself in his cell with the blanket. Converse alleges that, while Silvis was hanging himself, Dispatcher Whelan was "in the dispatch room with the monitors showing Mr. Silvis's jail cell, watching TV on the internet." Silvis's death was discovered 45 minutes later, at approximately 2:30 am.

Converse now contends that the City of Kemah and the individual Defendants failed to provide proper medical care to Silvis; failed to give him a "non-defective blanket;" and violated the City of Kemah's policies requiring prisoner medical requests be conveyed to a shift supervisor and that suicidal prisoners be given a "non-defective blanket" or "suicide smock." Converse alleges that the individual officers were ignorant of, or wholly ignored, these policies. Converse also alleges that Chief Rikard "falsely reported in the custodial death report" that Mr. Silvis "did not have mental issues."

Converse pleads that the conduct of the City and the Officers "caused the death of Mr. Silvis." Converse first specifically alleges that the City and the individual officers are liable for "negligence and gross negligence" under Texas law. Next, he alleges that the individual defendants "were deliberately indifferent to the serious risks associated with the mental state of Mr. Silvis and the risks/mental health issues posed to prevent this unfortunate death." Converse alleges that the individual defendants knew that Mr. Silvis was "physically and mentally impaired and suicidal," but failed to issue proper medical care and instead gave him the very blanket he used to commit suicide. Further, Converse contends that the officers failed to take away the blanket once it was given to Silvis, failed to check on Silvis or obtain medical help for him, failed to watch Silvis over monitors while he was in the cell, and then failed to discover his death for 45 minutes.

Converse alleges these failures were deprivations of Silvis's rights under the Eighth and Fourteenth Amendments.

Converse alleges that the City violated Silvis's constitutional rights by failing to treat Silvis's mental health problems, and by failing to create policies to attend to Silvis's mental health issues. Converse alleges that the City acted with "deliberate indifference to its actual knowledge of Mr. Silvis's suicidal state." Alternatively, Converse alleges that the City "adopted a custom or informal policy disregarding the constitutional rights of detainees." Converse highlights that, even though the City had a policy in place "to prevent detainees who displayed suicidal behavior from being given blankets," officers were allegedly told during their training to disregard this policy. Converse alleges that formal policies about securing medical attention for prisoners were also customarily ignored. In fact, Converse appears to allege that the City of Kemah routinely ignores *all* of its policies, stating, "For example, in a recent Houston Chronicle Article, Kemah residents accused the Mayor of Kemah of ignoring municipal and building codes."

Converse also brings a cause of action under the Texas Tort Claims Act, "since Mr. Silvis's death was caused by a condition or use of tangible personal or real property." Converse alleges that the blanket, the bunk, and the cell were all defective because they lacked the safety components to be used by a suicidal detainee.

The City has filed a motion to dismiss most, but not all, of Converse's claims under Federal Rule of Civil Procedure 12(b)(6). The City has not yet moved to dismiss the claims brought by the mother of Silvis's minor child.

## APPLICABLE LAW

### A.  Federal Rule of Civil Procedure 12(b)(6)

Under Rule 8 of the Federal Rules of Civil Procedure, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Id.*

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly*, 127 S.Ct. at 1965). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 127 S.Ct. at 1965). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 127 S.Ct. at 1966).

Moreover, the court does not accept as true legal conclusions: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 1950.

### B. Negligence and Gross Negligence Under Texas Law

Converse first alleges that the Defendants are all liable for negligence and gross negligence under Texas law. This Court has supplemental jurisdiction to decide the remaining state law claims that are a part of the same case or controversy. 28 U.S.C. § 1367(a).

### C. Section 1983

42 U.S.C. § 1983 provides a private right of action for the deprivation of rights, privileges, and immunities secured by the Constitution or laws of the United States. A complaint under § 1983 must allege that the acts complained of occurred under color of state law and that the complaining parties were deprived of rights guaranteed by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995). A complaint under § 1983 must also allege that the constitutional or statutory deprivation was intentional or due to deliberate indifference and not the result of mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Plaintiffs suing public officials under § 1983 must file short and plain complaints that must be factual and not conclusive. *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995) (en banc).

### D.  Medical Care for Pre-trial Detainees under the Fourteenth Amendment

"'[P]retrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'" *Hines v. Henson*, 293 Fed. App'x. 261, 263 (5th Cir. 2008) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001)). Further, "[t]o show that the right to medical care has been violated, a plaintiff must establish that 'the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference.'" *Hines*, 293 Fed. App'x at 263. In similar cases, the Fifth Circuit uses the standards set out in Eighth Amendment cases such as *Farmer* to evaluate claims that officials failed to prevent suicide by pre-trial detainees. *See Hare v. City of Corinth, Miss*., 74 F.3d 633, 648 (5th Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

As the Fifth Circuit has explained in a related context, the "subjective knowledge" prong here "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015) (citing *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970 (internal citation omitted)). A plaintiff may carry his burden here by alleging that the particular risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-

official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Id*. (internal quotation marks omitted). However, the knowledge at issue is that of the officers individually, not collectively. *See Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir.2007).

Further, "[w]hether a risk is substantial and the threatened harm is serious represents an objective test." *Hinojosa*, 807 F.3d at 665. In contrast, whether officials consciously disregarded the risk at issue represents a subjective inquiry. *Id*. Negligence, even gross negligence, is insufficient to establish deliberate indifference. *Hare*, 74 F.3d at 650 ("Our inquiry begins with the fundamental rule that negligent inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State."). Instead, a prison official acts with "deliberate indifference" when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Hinojosa,* 807 F.3d at 665; *see also Hare*, 74 F.3d at 643 ("[T]he proper inquiry is whether the official had a culpable state of mind in acting or failing to act . . . We adopt a standard of deliberate indifference as the measure of culpability for such episodic acts or omissions.").

In *Hines*, for example, the Fifth Circuit concluded that the fact that a detainee exhibited signs of intoxication, "including confusion, slurred speech, and loss of coordination," alone did not give an officer knowledge that the detainee was in serious need of medical care. 293 Fed. App'x. at 263 ("Hines has offered no evidence to show that he complained of his condition or requested medical assistance, nor has he offered

evidence showing that his medical condition was apparent and clearly necessitated medical care"). In contrast, in *Domino v. Texas Dept. of Criminal Justice*, the Fifth Circuit found that deliberate indifference could be demonstrated where a plaintiff established that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." 239 F.3d 752, 756 (5th Cir. 2001).

### E.  Texas Tort Claims Act

Under Texas law, a governmental entity's immunity is waived for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX. CIV. PRAC. & REM. CODE ANN. § 101.021. However, in a similar case involving a jail suicide, the Texas Supreme Court clarified, "[i]mmunity is not waived when the governmental unit merely 'allow[s] someone else to use the property and nothing more.'" *Dallas County v. Posey*, 290 S.W.3d 869, 871 (Tex. 2009) (per curiam) (holding inmate's use of telephone cord to commit suicide in county holding cell did not constitute "condition or use" of tangible personal property under Tort Claims Act) (citing *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex. 2004)); *see also Sides v. Texas Dep't of Criminal Justice*, 01-15-00004-CV, 2015 WL 6692136, at *3 (Tex. App.—Houston [1st Dist.] Nov. 3, 2015, pet. denied) ("A government actor waives immunity by providing allegedly dangerous property only if the property poses a hazard when put to its intended and ordinary use by the plaintiff.").

### F. Municipal Liability under § 1983

A municipality may be held liable under § 1983 only when the municipality itself causes a constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). This requires the execution of an official city policy or custom that results in the injury made the basis of the § 1983 claim. *Monell*, 98 S.Ct. at 2035–36. Proof of municipal liability sufficient to satisfy *Monell* requires: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).

In this context, an "official policy" may be (1) a policy statement, ordinance, or regulation, or (2) "a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)); *see also Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166 (5th Cir. 2010). "The description of a policy or custom and its relationship to the underlying constitutional violation, moreover, cannot be conclusory; it must contain specific facts." *Spiller v. City of Texas City*, 130 F.3d 162, 167 (5th Cir. 1997). "It follows that each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff, and it must be determined whether each one is facially constitutional or unconstitutional." *Piotrowski*,

237 F.3d at 579–80.  A municipality's policy of inaction despite awareness—constructive or actual—that its policy will cause a constitutional violation may be "'the functional equivalent of a decision by the city itself to violate the Constitution.'" *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 395, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

However, a plaintiff must point to more than the actions of municipal employees, he must also normally "identify a policymaker with final policymaking authority." *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003); *see also Piotrowski*, 237 F.3d at 578 ("[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur."). In determining whether the plaintiff has properly identified a policy maker, the "court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." *Id*. at 248.

The Court is also mindful that, "[o]fficial municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61.  In other words, a custom or policy can stem from a policy statement formally announced by an official policymaker, or it can be be demonstrated through a "'persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.'" *Zarnow*, 614 F.3d at 168-69 ("A pattern of conduct is necessary only when the municipal actors are not policymakers").

Such a pattern of conduct requires "similarity and specificity; [p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question . . . . A pattern also requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Peterson v. City of Fort Worth, Texas*, 588 F.3d 838, 851 (5th Cir. 2009). "If actions of city employees are to be used to prove a custom for which the municipality is liable, those actions must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees." *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984); *Peterson*, 588 F.3d at 850. In other words, "[i]t is not enough that an illegal custom exist; municipal policymakers, who are the persons capable of subjecting a municipality to liability, must be chargeable with awareness of the custom." *Milam v. City of San Antonio*, 113 Fed. App'x. 622, 626 n.3 (5th Cir. 2004); *see also Okon v. Harris County Hosp. Dist.,* 426 Fed. App'x 312, 316 (5th Cir. 2011) ("The governing body of the municipality or an official to whom that body has delegated policy-making authority must have actual or constructive knowledge of such a custom.").

The plaintiff must also allege that the policy at issue was the "moving force," or in other words, the "direct causal link" between the action and the deprivation of constitutional rights. *Piotrowski*, 237 F.3d at 579–80.

### G. Qualified Immunity Under Federal Law

Under federal law, public officials acting within the scope of their authority generally are shielded from civil liability by the doctrine of qualified immunity. *See*

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 106 S. Ct. 1092, 1096 (1986); *DePree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009). As a result, courts will not deny qualified immunity unless "existing precedent ... placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011). In conducting a qualified immunity analysis, each defendant's conduct must be examined individually. *See Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007).

Although qualified immunity is an affirmative defense, a plaintiff "has the burden to negate the assertion of qualified immunity once properly raised." *Collier v. Montgomery,* 569 F.3d 214, 217 (5th Cir. 2009). A plaintiff can meet this burden by alleging facts showing that the defendant committed a constitutional violation and that the defendant's actions were objectively unreasonable in light of the clearly established law at the time those actions were taken. *Atteberry v. Nocono General Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). To be "clearly established," the law must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, ––– U.S. –––, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015).

Further, the Fifth Circuit has taken pains to point out that the "objectively unreasonable" analysis here is not the same as the "deliberate indifference" analysis above—"[o]therwise, a successful claim of qualified immunity in this context would require defendants to demonstrate that they prevail on the merits, thus rendering qualified immunity an empty doctrine." *Hinojosa v. Livingston*, 807 F.3d 657, 672 (5th Cir. 2015).

### H. Official Immunity Under Texas Law

Under Texas law, official immunity is a common-law defense that protects government employees from personal liability in performing (1) discretionary duties (2) in good faith, so long as they are (3) acting within the scope of their authority. *Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994); *see, e.g., Wren v. Towe*, 130 F.3d 1154, 1160 (5th Cir. 1997) (noting, "Texas law of official immunity is substantially the same as federal qualified immunity law."). Texas state courts have held that police officers who failed to confiscate personal property of detainees and failed to properly monitor video screens during jail suicides are entitled to rely on the doctrine of official immunity against claims of negligence. *City of Coppell v. Waltman*, 997 S.W.2d 633 (Tex. App.–Dallas 1998, writ denied); *Butler v. City of Terrell*, 05-96-01845-CV, 1999 WL 62387, at *3 (Tex. App.— Dallas Feb. 11, 1999, pet. denied).

## ANALYSIS

Defendants have moved to dismiss Converse's Amended Complaint under Rule 12(b)(6), arguing that Converse's § 1983 claims fail because he has not alleged a violation of Silvis's constitutional rights, and that he failed to overcome the City's *Monell* immunity as well as each individual's qualified immunity. Defendants also contend that the Texas Tort Claims Act does not waive the City's immunity under Texas law.

The Court notes that the Defendants' motion does not seek dismissal of the claims asserted by the mother of Silvis's minor child.

### A. Claims under the Eighth Amendment

Defendants first contend that any claims asserted under the Eighth Amendment must be dismissed because Silvis was a pretrial detainee whose rights are secured by the Fourteenth Amendment. The Court agrees. *See, e.g., McMillan v. Mem'l Hermann Health Sys.*, No. H-14-1215, 2014 WL 7192263, at *6 (S.D. Tex. Dec. 16, 2014) ("Pretrial detainees enjoy the same rights as convicted prisoners to 'constitutional essentials like medical care and safety,' but that right emanates from the Fourteenth Amendment's due process guarantees, rather than the Eighth Amendment's protection against cruel and unusual punishment.") (citing *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000)).

Accordingly, the Court **GRANTS** the motion to dismiss all of Converse's claims against all of the Defendants under the Eighth Amendment.

### B. Claims under the Fourteenth Amendment against Individual Defendants

Next, the Court turns to the Defendants' contention that Converse has failed to state a claim under § 1983 for the deprivation of Silvis's rights under the Fourteenth Amendment. The Court first examines the claims against the individual officers, looking at the allegations in the live complaint to determine whether Converse has alleged specific facts that, if true, would be sufficient to: (1) demonstrate liability, *i.e.,* that each individual had "subjective knowledge of a substantial risk of serious harm to [Silvis] but responded with deliberate indifference," and (2) to overcome qualified immunity, *i.e.,* that each individual's actions were objectively unreasonable in light of the clearly established law at the time those actions were taken.

This process is difficult because many of Converse's allegations regarding Silvis's actions and statements are made without naming the individual who observed these actions and statements. For example, Converse generally alleges that, during the booking process, Silvis told "the officers" that he was unhappy, including stating that he was "ready to go to the doctor and see what is wrong with him," that he "did not have anyone," and general "talk of suicide." He does not, however, list the "officers" involved in the booking process by name. Similarly, Converse alleges that, after he was placed in a cell, Silvis "continue[d] to yell," and banged on the cell door, injuring his hands. Converse alleges that Silvis asked for a nurse for his hands, as well as for a cigarette, then "says that he should have jumped" and "that he is going to hurt himself." Again, Converse does not specify which of the individual officers, if any, heard or were made aware of these statements and acts by Silvis.

_____

- **Police Dispatcher Anna Marie Whelan**

Dispatcher Whelan is specifically alleged to have seen Silvis, in his jail cell, with a blanket. Broadly construed, Converse's pleading also alleges that Whelan, as one of the "individual Defendants" somehow knew that Silvis was "clearly in distress and wanting to complete his suicide attempt." Converse, does not, however, explain this allegation further. Converse also alleges that Whelan, as the Police Dispatcher, was "in the dispatch room with the monitors showing Mr. Silvis's jail cell, watching TV on the internet," at the time Silvis committed suicide. Converse does not allege that she was the individual tasked with monitoring Silvis's cell.

- **Police Chief Greg Rikard**

Converse's single allegation naming Police Chief Rikard is that he "filled out a custodial death report falsely stating the Mr. Silvis did not have any mental health problems." Converse does not allege that Chief Rikard was present in the Kemah Police Station during the time span between Silvis's arrest and suicide, nor does he otherwise allege any specific facts regarding Chief Rikard.

- **Officer Way**

Converse alleges that Officer Way was the first police officer to be made aware that Silvis was "a possible jumper" on the bridge. Along with Officer Melton and Officer Kimball, he is alleged to have arrested Silvis and taken him to the Kemah Police Department. Converse generally alleges that, during the booking process, Silvis told "the officers" that he was unhappy, including stating that he was "ready to go to the doctor and see what is wrong with him," that he "did not have anyone," and general "talk of suicide." Given the sequence of events and proximity of the allegations, a reasonable inference is that Converse alleges Officer Way was present during the booking process. Officer Way is also alleged to have been standing outside the cell when Silvis went in with the blanket. Officer Way is then alleged to have instructed Officer Kimball to remove Silvis's shoes, and to have entered Silvis's cell without removing the blanket. There are no allegations of any specific acts or omissions by Officer Way after Silvis was locked in his cell with the blanket.

- **Officer Kimball**

Officer Kimball is named as one of the officers who arrested Silvis on the bridge and brought him to the Kemah Police Department. As noted above, Converse generally alleges that Silvis told "the officers" during the booking process that he was considering suicide, and this allegation may be reasonably inferred to include Officer Kimball. Officer Kimball is specifically alleged to have given Silvis the blanket and then accompanied Silvis to the cell. Officer Kimball was instructed to remove Silvis's shoes, and Converse alleges that he entered Silvis's cell but failed to remove the blanket. There are no allegations of any specific acts or omissions by Officer Kimball after Silvis was locked in his cell with the blanket.

- **Officer Melton**

Officer Melton is also alleged to have been on the bridge with Silvis and to have been one of the officers who arrested Silvis and brought him to the Kemah Police Department. However, he is not named as one of the officers who observed Silvis enter his cell with the blanket, and he is not alleged to have entered the cell with Officers Way and Kimball. There are no allegations of any specific acts or omissions by Officer Melton after Silvis was locked in his cell with the blanket.

- **Officer Kirby**

The only specific allegation about Officer Kirby is that he was outside the cell when Silvis entered it with a blanket. Broadly construed, Converse's pleading also alleges that Kirby, as one of the "individual Defendants," somehow knew that Silvis was "clearly in distress and wanting to complete his suicide attempt." However, Officer Kirby

is not alleged to have been present during Silvis's arrest or booking. There are no allegations of any specific acts or omissions by Officer Melton after Silvis was locked in his cell with the blanket.

---

This case presents troubling allegations that public employees and law enforcement officers wholly ignored the obvious distress and risk of death of a suicidal person under their care, and that they further failed take steps to prevent his entirely predictable death. However, upon consideration of the pleadings and arguments, as well as the Fifth Circuit's governing precedent and instructions in cases such as *Backe v. LeBlanc*, 691 F. 3d 645 (5th Cir. 2012), the Court finds that Converse has failed to allege specific facts that would allow this Court to draw the reasonable inferences that Chief Rikard committed a constitutional violation and that his alleged actions as a Police Chief were objectively unreasonable in light of the clearly established law at the time those actions were taken. *Hare*, 74 F.3d at 643; *Hines*, 293 Fed. App'x at 263; *Atteberry,* 430 at 253; *see also Taylor v. Barkes*, 135 S. Ct. 2042 at 2044.

In contrast, Converse has alleged enough facts to allow the Court to draw the reasonable inference that Officers Way, Kimball, Melton, and Kirby, and Dispatcher Whelan, may be liable for the harm alleged, and further, those facts defeat their claims to qualified immunity, *i.e.,* that each individual's actions were objectively unreasonable in light of the clearly established law at the time. *Hare*, 74 F.3d at 643; *Hines*, 293 Fed. App'x at 263; *Atteberry,* 430 at 253; *see also Taylor v. Barkes*, 135 S. Ct. 2042 at 2044.

Accordingly, the Court will deny the Defendants' Rule 12(b)(6) motion on the issue of the qualified immunity for these defendants because dismissal on a Rule 12(b)(6) motion is not appropriate at this time. However, despite this determination, the Court remains unable to rule on the qualified immunity defense of Officers Way, Kimball, Melton, and Kirby, and Dispatcher Whelan, without further clarification of the facts, and therefore, the Court finds that limited discovery is appropriate. This limited discovery should be tailored to the personal knowledge and personal conduct of each of Officers Way, Kimball, Melton, and Kirby, and Dispatcher Whelan, as it relates to the suicide of Silvis, and to the circumstances that directly lead to his death. Such discovery may include these Defendants' prior interactions with or knowledge regarding Silvis, as well as their personal knowledge regarding the risk that persons detained in jail after arrest might commit suicide, whether they are aware of appropriate protocols or policies for police officers and jails to use in responding to that risk, and whether these individual Defendants ever received any training on evaluating and responding to the risk that persons detained in jail after an arrest might commit suicide. This limited discovery may include the depositions of Officers Way, Kimball, Melton, and Kirby, and Dispatcher Whelan, as well as requests for production of documents and tangible or electronic items. This limited discovery may also include a request for production of, and discovery regarding the care, custody, and control of, any video of Silvis on the evening in question. It is preferred that, if possible, discovery be conducted via interrogatories and other written methods, and that depositions be noticed only if necessary and upon the least intrusive terms possible.

### C. Claims under the Fourteenth Amendment against the City

The Court has carefully reviewed Converse's allegations that the City is liable for alleged violations of Silvis's constitutional rights. Essentially, Converse alleges that, even though the City of Kemah had a policy of refusing to provide blankets to suicidal detainees, its police officers either did not know of that policy, or they wholly refused to follow it. Converse also alleges that the City of Kemah had an informal policy of encouraging its police officers to be ignorant of its official policies. However, Converse has not pointed to other instances of jail policies being unknown or ignored, and he has not alleged any prior instances of suicides while in the custody of the Kemah Police Department. Nor has he alleged a general risk of post-arrest jail suicides of which the City of Kemah was or should have been aware.  Accordingly, upon consideration of the pleadings and arguments, as well as *Monell v. Dept. of Soc. Servs*., 436 U.S. 658, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978), the Court finds that Converse's claims against the City for violations of § 1983 should be dismissed and the City's 12(b)(6) motion on this ground should be **GRANTED**.

### D. Texas Tort Claims Act Against the City

Similarly, the Court finds that Defendants' motion to dismiss Converse's claims under the Texas Tort Claims Act should also be **GRANTED**. The Court finds that, even taking all of Converse's allegations as true, this result is dictated by Texas law. *See, e.g., Dallas County v. Posey*, 290 S.W.3d 869, 871 (Tex. 2009) (per curiam); *see also Sides v. Texas Dep't of Criminal Justice*, 01-15-00004-CV, 2015 WL 6692136, at *3 (Tex. App.—Houston [1st Dist.] Nov. 3, 2015, pet. denied).

## CONCLUSION

In light of the foregoing, the Court finds that the Defendants' motion to dismiss should be **GRANTED**, **in part**, and that all of Converse's claims under the Eighth Amendment, as well as his Fourteenth Amendment claims against the City and Police Chief Rikard should be **DISMISSED**. Similarly, the Court finds that the Defendant's motion to dismiss Converse's claims under the Texas Tort Claims Act should also be **GRANTED**.

However, for the reasons stated above, the Court **DENIES** the motion to dismiss Converse's Fourteenth Amendment claims against Officers Way, Kimball, Melton, and Kirby, and Dispatcher Whelan, and **ORDERS** that limited discovery should proceed in accordance with this Order.

SIGNED at Galveston, Texas, this 12th day of October, 2016.

George C. Hanks Jr.
United States District Judge