United States District Court
Southern District of Texas
**ENTERED**
May 26, 2022
Nathan Ochsner, Clerk

# In the United States District Court for the Southern District of Texas

## GALVESTON DIVISION

No. 3:15-cv-105

RONALD LEE CONVERSE, *ET AL.*, *PLAINTIFFS*,

v.

CITY OF KEMAH, TEXAS, *ET AL.*, *DEFENDANTS*.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, *UNITED STATES DISTRICT JUDGE*:

Before the court is the officer-defendants James Melton, Marcus Way, Anna Marie Whelan, and Reuben Kimball's motion for summary judgment. Dkt. 109. Having considered the arguments, the summary-judgment evidence, and the applicable law, the court grants in part and denies in part.

## I.   Background

This case arises out of the suicide of Chad Silvis while he was detained in the City of Kemah jail. On April 11, 2014, shortly past midnight, a passerby flagged down Kemah Police Sergeant Marcus Way to tell him that a man was at the top of the Kemah Clear Creek bridge and appeared ready to jump. Dkt.

75 ¶ 16 (Second Amended Complaint). Way broadcasted on his police radio that there was a possible "jumper" on the bridge. *Id.* Sergeant James Melton, Officer Reuben Kimball, and Telecommunications Officer/Dispatcher Anne Marie Whelan all heard the call. *Id.*

Way arrived at the top of the bridge to find Silvis sitting on the railing with his feet over the edge. *Id.* ¶ 17. He appeared impaired and was drinking from a pint bottle of whiskey. Dkt. 109-1 at 2. Way called dispatch for backup, and Kimball and Melton soon joined him. Dkt. 75 ¶ 17. Eventually the three officers succeeded in safely pulling Silvis off the railing. *Id.* ¶ 18. Silvis was handcuffed and Kimball transported him to the Kemah jail. *Id.* After Silvis was booked, processed, and taken to his cell, Way directed Kimball to take Silvis's shoes—a typical precaution with suicidal inmates. *Id.* ¶ 20–22. Kimball had, however, given Silvis a blanket during his in-processing when Silvis complained he was cold. *Id.* ¶ 21. Way was present when Silvis was placed in the cell with the blanket. *Id.* Whelan and Melton also each came by Silvis' cell at different times while he possessed the blanket. *Id.*

At about 1:44 a.m., Silvis used the blanket Kimball had given him to hang himself from the top bunk of the cell's metal bedframe. *Id.* ¶ 25. Forty-five minutes passed before the officers realized what had happened. *Id.* ¶ 26.

The decedent's father, Ronald Converse, sued the City of Kemah and the officers as representative of Silvis's estate and in his individual capacity. *Id.* ¶ 1. Converse's suit was consolidated with that of Sara Monroe who sued as next friend of Silvis's minor child, B.S. Dkt. 109 at 9; *see also* Dkt. 46 (Order of Consolidation).

The plaintiffs allege three causes of action against Kemah and the officers: (1) § 1983 claims against the officers for violating the Eighth and Fourteenth Amendments; (2) supervisory liability under § 1983 against Melton; and (3) municipal liability under § 1983 against Kemah. Dkt. 75 ¶¶ 40–57.[1] The plaintiffs seek wrongful-death and survival damages, costs to repair damage to Silvis's personal property, funeral expenses, and exemplary damages. *Id.* ¶ 66.

## II.   Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence in the light most favorable to the nonmovant. *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). The movant bears the burden of presenting the basis

---

[1] The court dismissed the plaintiffs' claims against Kemah under the Texas Tort Claims Act at the motion-to-dismiss stage. Dkt. 51 at 21.

for the motion and the elements of the causes of action for which a genuine dispute of material fact does not exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to offer specific facts showing a genuine dispute for trial. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

The court "may not make credibility determinations or weigh the evidence" in ruling on a summary-judgment motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But when the nonmoving party has failed "to address or respond to a fact raised by the moving party and supported by evidence," then the fact is undisputed. *Broad. Music, Inc. v. Bentley*, No. SA-16-CV-394-XR, 2017 WL 782932, at *2 (W.D. Tex. Feb. 28, 2017). "Such undisputed facts may form the basis for summary judgment." *Id.* The court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant. *United States v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

## III.  Analysis

### A.  The Law of Qualified Immunity

"Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Gates v. Tex. Dep't of Protective & Reg. Servs.*, 537 F.3d 404, 418 (5th Cir. 2008). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). And "it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Qualified immunity is an immunity from suit rather than a mere defense to liability." *Pearson*, 555 U.S. at 237 (internal quotation marks omitted).  Even more, it alters the usual summary-judgment burden of proof:

> Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law. The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor.

*Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

The qualified-immunity analysis is a two-pronged inquiry: "whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Id.* The court may rely on either prong in its analysis, *id.*, and has the "discretion to decide which prong to consider first." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citing *Pearson*, 555 U.S. at 236).

"If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'" *Id.* (quoting *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004)). "Whether an official's conduct was objectively reasonable is a question of law for the court, not a matter of fact for the jury." *Id.*

"Since at least 1989, it has been clearly established that officials may be held liable for their acts or omissions that result in a detainee's suicide if they 'had subjective knowledge of a substantial risk of harm to a pretrial detainee but responded with deliberate indifference to that risk.'" *Converse v. City of Kemah*, 961 F.3d 771, 775 (5th Cir. 2020) (quoting *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 394 (5th Cir. 2000)); *see also Flores v. Cnty. of Hardeman,* 124 F.3d 736, 738 (5th Cir. 1997) ("A detainee's right

to adequate protection from known suicidal tendencies was clearly
established when Flores committed suicide in January 1990.").

Because there was clearly established law at the time of Silvis's suicide,
the sole remaining question for this court is whether each officer's conduct
violated Silvis's rights.

> The sometimes confusing relationship between these two
> standards—qualified immunity's "objective reasonableness"
> standard and the Fourteenth Amendment's 'subjective deliberate
> indifference' standard—has been distilled as follows: "[W]e are
> to determine whether, in light of the facts as viewed in the light
> most favorable to the plaintiffs, the conduct of the individual
> defendants was objectively unreasonable when applied against
> the deliberate indifference standard."

*Converse*, 961 F.3d at 775 (quoting *Jacobs*, 228 F.3d at 394).

> A prison official will not be held liable if he merely 'should have
> known' of a risk; instead, to satisfy this high standard, a prison
> official "must both be aware of facts from which the inference
> could be drawn that a substantial risk of serious harm exists, and
> he must also draw the inference."

*Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). An official shows
a deliberate indifference to that risk "by failing to take reasonable measures
to abate it." *Hare v. City of Corinth*, 74 F.3d 633, 648 (5th Cir. 1996) (en
banc).

The Fourteenth Amendment's protections for pretrial detainees
include requiring detention officers to take reasonable, prophylactic steps to
prevent suicide when a detainee is an actual suicide risk. *See Flores*, 124 F.3d

at 738. Federal law does not support a claim for general failure to prevent a detainee from committing suicide, or general failure to implement suicide-prevention procedures. *Taylor v. Barkes*, 575 U.S. 822, 826 (2015) (per curiam). "[T]he proper inquiry is whether the jail official had a *culpable state of mind* in acting or failing to act." *Hare*, 74 F.3d at 643 (emphasis added).

The "inquiry begins with the fundamental rule that negligent inaction by a jail officer does not violate the rights of a person lawfully held in custody by the State." *Id.* at 645. Liability for inaction by detention personnel attaches only when an officer's failure to act amounts to deliberate indifference to a detainee's rights. *Id.* at 639. "Deliberate indifference, *i.e.*, the subjective intent to cause harm, cannot be inferred from [an officer's] failure to act reasonably." *Hare*, 74 F.3d at 649. "[E]ven if an officer responds without the due care a reasonable person would use–such that the officer is only negligent–there will be no liability." *Hyatt v. Thomas*, 843 F.3d 172, 178 (5th Cir. 2016) (citing *Davidson v. Cannon*, 474 U.S. 344, 347 (1986)). "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001).

"The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the jail officials were actually aware of the risk, yet consciously disregarded it." *Lawson v. Dallas Cnty.*, 286 F.3d 257, 262

(5th Cir. 2002) (emphasis added). "[L]iability attaches only if [an officer] actually knew—not merely should have known—about the risk." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528 (5th Cir. 1999).

"Specifically in the pretrial-detainee-suicide context, 'a plaintiff must show that public officers were [1] aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn; [2] that they actually drew the inference; and [3] that their response indicates subjective intention that the harm occur.'" *Garza v. City of Donna*, No. 7:16-CV-00558, 2017 WL 6498392, at *7 (S.D. Tex. Dec. 15, 2017) (internal citations omitted); *see also Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009). "Evidence of negligence, or even gross negligence, is not enough." *Id.* (citing *Sanchez v. Young Cnty., Texas*, 866 F.3d 274, 280 (5th Cir. 2017)).

Mere "evidence that an official was aware of a substantial risk to inmate safety does not alone establish deliberate indifference." *Hyatt*, 843 F.3d at 177. Officers "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 847. Reasonableness in this context must be tempered by the conflicting demands placed on officers charged with attempting to protect individuals who are detained. *See generally Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015)

(recognizing that "[r]unning a prison is an inordinately difficult undertaking" and that "safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face" (internal citations omitted)).

The court applies these principles to assess the conduct of each individual defendant in turn.

## B. Application to Individual Defendants

### 1. Sergeant Melton

Melton argues that he is entitled to summary judgment because his conduct was reasonable under the circumstances. In turn, to survive summary judgment, the plaintiffs must show a genuine issue of material fact as to Melton's deliberate indifference to the risk of harm Silvis posed to himself. *Tamez*, 589 F.3d at 770. To show subjective deliberate indifference, the plaintiffs must present evidence (1) that Melton had subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn; (2) that Melton actually drew that inference; and (3) that Melton's response to the risk reflects that he subjectively intended that harm to occur. *Id.*

Melton argues he did not violate the Fourteenth Amendment. To the contrary, he argues that the uncontroverted evidence shows that he risked his life to prevent Silvis from committing suicide on the bridge and took reasonable steps to protect Silvis from harming himself at both the bridge (after he was taken off the ledge) and again at the Kemah jail. Dkt. 109 at 17. Because Melton did not believe it was safe for the paramedics to triage Silvis on the bridge, as it would require them to remove Silvis from the police vehicle he was detained in, the medical evaluation was conducted at the Kemah jail. Dkt. 109-1 at 3 (Melton Declaration). The paramedics found no reason to transport Silvis from the police station to the hospital for further examination or treatment. *Id.*

Melton states he then contacted a mental-health professional trained through the Texas Commission on Law Enforcement and employed by the Galveston County Sheriff's Office Mental Health Division about Silvis. *Id.* The mental-health professional informed Melton it was necessary for Silvis to sober up before his mental health could appropriately be assessed. *Id.* at 4. The mental-health professional directed Melton to detain Silvis overnight based on his public intoxication and that a mental-healthcare deputy would arrange for a provider to assess Silvis at the police station in the morning. *Id.*

Melton argues he deferred to the expertise of the paramedics and the mental-health professional's decision not to remove Silvis from the jail. *Id.* Melton states had "no reason to suspect Silvis would likely harm himself inside the cell, and [he] knew of no need for more or different monitoring of Silvis than [he] understood would be done." *Id.* Melton believed Silvis had been searched before he was placed in the cell, so he had "no reason to believe he possessed any weapon, or even blanket, to harm himself." *Id.* Melton "never saw a blanket inside Silvis's cell and [] did not know he had one." *Id.* Additionally, Melton "knew officers periodically check[ed] on Silvis's condition inside the cell," and that there was also video monitoring of the cell's interior. *Id.* While Silvis was in the cell and before his death, Melton had some interactions with him about noise and Silvis's desire to smoke a cigarette, but Melton could not see the blanket from his vantage point. Dkt. 109 at 5.

The plaintiffs respond that each defendant knew that Silvis was suicidal and actively trying to harm himself; that it was against jail policy to provide a suicidal inmate with items such as a blanket; that Silvis had been provided with a blanket; and yet each defendant chose to do nothing. Dkt. 118 at 5. The plaintiffs argue that Melton was aware of the policy that suicidal detainees were not to be issued a blanket; that jail suicides were a "problem";

that one method of committing suicide was with bedding; and that detainees had their shoelaces taken in order to prevent suicide. *Id.* The plaintiffs also argue because Melton interacted with Silvis on the bridge, he knew Silvis was serious about committing suicide, and knew that Silvis's intention to commit suicide had not changed during his detention. *Id.* at 5–6. The plaintiffs point out that Melton can be seen on video footage interacting with Silvis, Way, and Kimball while Silvis is holding the blanket, and that Melton looked into the cell where the blanket was clearly visible. Dkt. 118 at 6.

The video evidence the plaintiffs cite to for this proposition, however, shows only Way, Kimball, and an unidentified Seabrook Police Department officer interacting with Silvis in the jail hallway as Silvis is holding a jail-issued orange blanket. Def. Ex. 6 at 1:00-2:30; *see also* Dkt. 119 at 8. Melton is not seen in that video until about the 16-minute mark, at which point he is looking in on Silvis in his cell. Def. Ex. 6 at 16:00-18:00. In-cell video reveals that at the two discrete points in time Melton is checking on Silvis, no blanket is clearly visible. The blanket is first on the floor, partially underneath the lower bunk-bed mattress (at the 24:30-mark on the video) during Melton's first visit and then placed out of view of the in-cell camera, at the 25-minute mark, by Silvis before Melton's extended, second visit. Def. Ex. 8.

The plaintiffs present no other evidence that Melton was aware of the presence of the blanket and thus cannot satisfy the requirement to show Melton had "subjective knowledge of facts from which an inference of serious harm could be drawn." *Tamez*, 589 F.3d at 770. While the plaintiffs discredit as self-serving Melton's declaration that he did not know Silvis had a blanket, Dkt. 109-1 at 4, the plaintiffs' own deposition of Melton elicited no testimony to the contrary, Dkt. 118-1. Because the plaintiffs, as the nonmoving parties, have failed to show the existence of an element essential to their case and on which they will bear the burden of proof at trial, *Celotex Corp.*, 477 U.S. at 322–23, Melton is entitled to summary judgment on the § 1983 claims against him.[2]

### 2. Sergeant Way

Sergeant Way argues he is entitled to summary judgment because he acted with objective reasonableness when he helped Melton prevent Silvis from completing suicide and directed Kimball to remove Silvis's shoes before Kimball placed Silvis in the cell. Dkt. 109 at 18. Way believed Silvis had no means available to harm himself in the cell because he observed several officers and Melton interact with Silvis and that he also knew the dispatch

---

[2] The plaintiffs have abandoned their § 1983 supervisory-liability claim against Melton by failing to pursue it beyond the amended complaint. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (finding failure to pursue a claim beyond the complaint constituted abandonment).

office had video monitors available to observe Silvis in his cell. *Id.* Finally, Way states he was already off-duty and at home when Silvis committed suicide. *Id.*

The plaintiffs argue, however, that a fact question exists as to whether Way knew Silvis had a blanket. They point to evidence showing that Way interacted with Silvis while Silvis was holding the blanket. Dkts. 118 at 6; 118-2 at 2–3. Because Way was "aware of the facts" from which an inference could be drawn that Silvis posed a substantial risk of harm to himself, the plaintiffs argue that summary judgment for Way is improper.

Video evidence of the hallway shows Kimball and the unidentified Seabrook police officer escorting Silvis to his cell, uncuffing Silvis, and putting him in the cell. Def. Ex. 6 at 00:49–2:30. Silvis is holding the jail-issued orange blanket throughout his appearance on camera. *Id.* The back and top of Way's head is visible in the bottom of the video, and he can be seen facing the jail cell and the other officers while Silvis is speaking with Kimball and the unidentified officer. *Id.* At the 1:25-minute mark, Way comes on camera to instruct Kimball to take Silvis's shoes. *Id.* Shortly after, Way is seen at the door of the cell while Kimball, who is inside the cell and not visible from this camera angle, removes and tosses Silvis's shoes out of the cell. *Id.*

The interior-cell video shows Silvis and Kimball inside the cell while Silvis's shoes are being removed. Def. Ex. 8 at 1:25–2:00. Way's left hand can be seen as he shakes Silvis's hand, all while Silvis is still holding the jail issued orange blanket. *Id.* at 1:53. Way testified at his deposition that his view of the blanket was blocked by Kimball's body when he was at the threshold of the jail cell. Dkt. 118-2 at 9.

Way argues that the video evidence "proves that Officer Kimball's body obstructed [his] view of Silvis holding the blanket and proves that [he] directed Officer Kimball to remove Silvis' shoes." Dkt. 119 at 8. The video evidence does indeed prove that Way directed Kimball to remove Silvis's shoes. But it is not dispositive as to whether Way's view of the blanket was blocked throughout the hallway interaction among Kimball, the unidentified officer, and Silvis. Nor is it clear that during the in-cell interaction among Silvis, Kimball, and Way, that Way's view of the orange blanket, sometimes loosely held by Silvis, was completely out of sight. Indeed, the length of the interaction and the movement of the individuals on camera cautions against a dispositive conclusion.

As this case is at the summary-judgment stage, it is appropriate to view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary-judgment] motion." *United States v. Diebold,*

*Inc.,* 369 U.S. 654, 655 (1962) (per curiam). Accordingly, the court finds a fact issue remains as to whether Way knew Silvis had a blanket. Coupled with the evidence the plaintiffs have presented establishing that Way knew Silvis was suicidal and that it was against policy to give suicidal individuals blankets, a genuine issue of material fact exists on whether Way was both aware of the substantial risk of harm and that he drew such an inference while on duty that night. Accordingly, the court denies Way's motion for summary judgment.

### 3.  Officer Kimball

Officer Kimball, who was present with Silvis at the Kemah bridge and escorted him throughout the booking process at the jail, argues that he is entitled to summary judgment because Silvis's change in demeanor led him to mistakenly believe Silvis had regained control of his emotions and was no longer a suicide threat. Dkt. 109 at 19. Kimball contends that because he searched Silvis and removed his shoes, he subjectively believed Silvis did not pose a threat to himself. *Id.* Kimball also explains that he gave Silvis a blanket for warmth because Silvis was not wearing a shirt and said he was cold. *Id.* Kimball admits to knowing Silvis possessed a blanket in the cell, but asserts he did not perceive it as a safety risk because he believed Silvis had calmed down, knew officers periodically checked on Silvis's condition inside the cell,

and knew there was a camera inside the cell that the dispatcher could use to continuously monitor Silvis. *Id.* at 20. Kimball believed dispatchers would notice if Silvis tried to harm himself with anything, including the blanket. *Id.*

The plaintiffs respond that Kimball knew it was against Kemah policy to give suicidal inmates blankets and that he was familiar with other, similar jail policies and the reason for them. Dkts. 118 at 6; 118-4 at 3–4, 7, 9. The plaintiffs argue Kimball knew Silvis was suicidal, with a "litany of reasons for wanting to kill himself, none of which could have changed over the course of his short detention." Dkt. 118 at 7.

The plaintiffs have presented evidence establishing a material fact issue as to whether Kimball had subjective knowledge of facts from which an inference of substantial risk of serious harm to Silvis could be drawn. A fact issue exists as to whether Kimball knew that Silvis remained a suicide threat warranting prophylactic steps by the officers that night, such as denying Silvis a blanket. Accordingly, Kimball's motion for summary judgment is denied and the plaintiffs' claim against him survives.

### 4. Officer Whelan

Officer Whelan argues that she is entitled to summary judgment because her conduct does not rise to the level of deliberate indifference, but can be characterized as mere negligence.

Whelan was working dispatch when the initial call of a jumper came in and was the dispatcher who alerted Kemah law-enforcement units to Silvis's presence on the bridge. Dkt. 118-3 at 6. Whelan was aware EMS personnel had examined Silvis at the police station and had visited Silvis in his cell, and she was also able to see the activities that occurred inside Silvis's cell via the video monitor in the dispatch office. Dkt. 109 at 18. Whelan concedes she did not perform her observations as diligently as required, but that mere negligence does not amount to deliberate indifference. *Id.* Whelan states that had she known that Silvis had a blanket in his cell, she may have observed Silvis more closely. *Id.* at 18–19.

The plaintiffs argue that summary judgment is improper because a fact issue exists as to whether Whelan knew Silvis had a blanket in his cell. The plaintiffs offer evidence that Whelan knew it was against policy to give a suicidal inmate a blanket, Dkts. 118 at 6; 118-3 at 6, 12, that she was able to regularly check on Silvis's status on the video monitor which clearly displayed the bright orange jail blanket, Dkt. 118-3 at 8–9, and that she knew Silvis was in fact suicidal and had attempted to jump off the Kemah bridge, Dkt. 118-3 at 6. On the video footage, Whelan can be seen talking to Silvis in person, through the meal-tray slot in his cell door. Def. Ex. 6 at 08:48–14:36.

The corresponding in-cell footage during this time-stamp range shows the orange blanket laying on the floor of the cell. Def. Ex. 8 at 13:30–14:45.

Whether the blanket was visible from the meal-tray slot in the door and whether Silvis's body potentially blocked Whelan's view of the blanket are unclear. Not up for debate, however, is that the in-cell footage did capture the blanket and that such footage was displayed in the dispatch office for all of Silvis's time in the jail cell, including the 45 minutes he spent tying the blanket to the bed frame, positioning himself and the blanket to complete his asphyxiation, and remaining there until discovered. Def. Ex. 8 at 41:30–47:45.

Two issues complicate what would otherwise be a straightforward analysis. The cameras that Whelan used to monitor the in-cell activity of inmates were installed the day before Silvis committed suicide, so they were new to her when she came to work that day.[3] Dkt. 118-3 at 2. Additionally, Whelan was a retired master peace officer,[4] with over 25 years of law-enforcement experience before retiring in 2007 and switching to dispatch work as a telecommunications officer. *Id.* at 2–3, 6. The very recent

---

[3] Only the cameras *in* the jail cells were new. The cameras monitoring the booking area, where Kimball gave Silvis the blanket, were not new. Dkt. 118-3 at 5.

[4] Texas peace-officer proficiency levels are basic, intermediate, advanced, and master. Texas Commission on Law Enforcement, *available at* https://www.tcole.texas.gov/content/proficiency-certificates.

introduction of the in-cell cameras and Whelan's alleged unfamiliarity with the monitors buttresses Whelan's justification for her failure to properly monitor Silvis. Her profound experience as a peace officer, however, cuts against her argument that any omission on her part to monitor a clearly unstable, emotionally volatile, and suicidal inmate was merely negligent, and instead raises a fact question on her knowledge of the substantial risks present that night.

Viewing the facts and drawing reasonable inferences "in the light most favorable to the [non-moving party]," *Diebold*, 369 U.S. at 655, the plaintiffs have presented sufficient evidence to create a material fact issue on whether Whelan had subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn, that she did in fact draw that inference, and that her response to the risk reflected she subjectively intended that harm to occur. The plaintiffs' claim against Whelan survives summary judgment.

\*     \*     \*

For all of the above reasons, the court grants in part and denies in part the officers' motion for summary judgment. Dkt. 109. The plaintiffs' claims against Melton are dismissed; the claims against Way, Kimball, and Whelan survive.

Signed on Galveston Island this 26th day of May, 2022.

_____

JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE